UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| BEST WESTERN INTERNATIONAL ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-4049 |
| ) | |
| PRIME TECH DEVELOPMENT, L.L.C.., ) | |
| ) | |
| Defendant. ) | |

## ORDER

Now before the Court is Defendant Prime Tech Development, L.L.C.'s Motion for Summary Judgment.  For the reasons set forth below, the Motion [#20] is GRANTED IN PART and DENIED IN PART.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367, as some of the claims asserted in the Complaint present federal questions under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*.

## BACKGROUND

This is an action for breach of contract, federal trademark infringement, and unfair competition under the Lanham Act, 15 U.S.C. §§ 1501 *et seq*., and related common law and statutory causes of action.  The facts giving rise to this case involve the business relationships and agreements among three companies:  Plaintiff Best Western International ("Best Western"), Defendant Prime Tech Development, L.L.C. ("Prime Tech"), and Platinum Properties of the Quad Cities, Inc. ("Platinum Properties" or Platinum).

On or about October 18, 2001, Prime Tech and Platinum Properties entered into a written Agreement for Purchase concerning the construction of a seventy-five room hotel. The summarized terms of the agreement are as follows: Michael Shamsie and Stephen Owsley, two of the three members of Prime Tech, agreed to transfer a plot of real estate, which they owned as individuals, to Prime Tech; Prime Tech would obtain a construction and mortgage loan on the real estate and would build a seventy-room Best Western hotel on the real estate; Platinum Properties would purchase the completed hotel project from Prime Tech, through series of payments. It is undisputed that all parties to the agreement intended that Prime Tech would sell the project to Platinum Properties as a completed hotel project, including furniture and fixtures, as a "turnkey" operation, though the parties dispute who made the decision that the hotel would be a Best Western. The Agreement was executed by Shamsie and Owsley as individuals; Shamsie, Owsley and Lynn Fox, for Prime Tech; and Lynn Brewer, Gary L. Haytcher, and Betty L. Haytcher, for Platinum Properties. Prime Tech's relationship with Platinum Properties was solely an Agreement for Purchase of the hotel and real estate.

After the Agreement's execution, construction of the hotel project commenced. On April 17, 2002, a Best Western International, Inc. Membership Application and Agreement was completed and signed by Russell Bentley for Platinum Properties, as Owner or Lessee, and Lynn Brewer for Platinum Properties, as Authorized Signer and Voting Member. Under the form's terms, the "Membership Agreement" portion would become operative only upon Best Western's written approval of the application. An application and membership fee were apparently submitted to Best Western around this time. Best Western conditionally accepted the Application on May 10, 2002.

2

In October 2002, financing for the project was completed. On or about January 15, 2004, an Agreement for Sale of Real Estate between Prime Tech, as seller, and Platinum Properties, as purchaser, was prepared and signed by Shamsie, for Prime Tech. It is not clear if it was ever executed by Platinum Properties. Shamsie testified that about this time, in early 2004, Prime Tech allotted funds in the escrow account for construction financing to obtain a Best Western membership.

Though the time frame is not clear in the record, at some point during construction phase of the hotel project, two Best Western signs were installed on the premises. Also during the construction phase, Shamsie met with Betty Haytcher regarding furnishings for the hotel rooms. Though there was no formal agreement between Prime Tech and Platinum Properties regarding furnishings and fixtures, Prime Tech was to pay for furnishings but members of Platinum Properties would be involved in the selection, as Platinum was to be the ultimate owner of the hotel. Shamsie met with Betty Haytcher to go over a design scheme that had been put together by an interior design firm from Georgia. Betty Haytcher ordered from the Georgia firm the majority of the fixtures, which were paid for from the construction escrow account. Shamsie testified that he eventually learned that the mattresses were ordered from Best Western, through the Membership Agreement. But, Shamsie did not know that this was being done; he assumed that the mattresses had been part of the order from the Georgia firm, since the firm pitched the furnishings scheme as "a whole package." Def.'s Ex. 4, Shamsie Dep., at 58. In its Motion for Summary Judgment, Prime Tech states that "[t]here are apparently charges that the Plaintiff is requesting relating to mattresses. This is upon information and belief because the Plaintiff has never itemized [the monetary damages it seeks in its Complaint]." Mtn for Summ. J., at 8 n.1.

3

On July 2, 2004, Best Western International sent a letter to Lynn Brewer informing her that the Best Western Membership was "being canceled immediately," for a failure to pay outstanding amounts due on the account. For reasons not in the record, Platinum Properties failed to complete purchase of the project from Prime Tech. Prime Tech has been in continuous possession of the hotel project since construction began, and that possession continues to this date.

On September 21, 2004, after learning that the Best Western Membership was not its name, Prime Tech applied for a Best Western Membership. Best Western gave Prime Tech the options of paying a new membership fee in addition to paying the balance of the indebtedness owed by Platinum Properties, or get Platinum Properties to assign its Membership to Prime Tech and pay a $5000 transfer fee and the outstanding balance of the indebtedness owed by Platinum Properties. On September 27, 2004, Prime Tech's counsel sent a letter to Betty Haytcher, providing notice that all purchase agreements with Prime Tech were officially deemed null and void. The letter also asks Haytcher to remove any personal property from the hotel premises and states "[W]e would expect that any and all documents relating to operations of the Best Western Deer View Run including: (1) Phone reservation system; (2) Franchise Agreement; and (3) Any and all other legal documents relating to the Best Western Deer View Run will be assigned to Prime Tech Development, L.L.C., immediately." Pl.'s Resp., Ex. 8.

Subsequently, Prime Tech declined to pursue a Best Western membership and applied for and received a Ramada Franchise for the hotel project. The hotel opened as a Ramada Franchisee in February 2005. The Best Western signs remained on the property, though they were "bagged" with Ramada plastic covers. The parties dispute whether the Best Western signs were actually disguised, and Best Western states that their marks were still visible to the public

4

at night, despite the Ramada bags, when the signs were lighted. The two Best Western signs were removed on or about May 27, 2005, within 24 hours after Shamsie was told to remove them from the hotel premises.

The Best Western Membership Agreement includes a license to use the Best Western name and trademark and service marks in connection with the hotel. According to the Agreement, upon termination of the membership, the former members are required to cease use of the Best Western name and trademarks within fifteen days. Continued use of the Best Western name and trademarks beyond the fifteen days subjects the former member to certain liquidated damages set forth in the Agreement.

Best Western filed the Complaint and an accompanying Motion for Preliminary Injunction on May 25, 2005. On June 1, Best Western voluntarily withdrew its Motion for Preliminary Injunction because Prime Tech had taken down the Best Western signs (presumably upon notice of the Motion), and therefore had already fulfilled the primary relief Best Western sought in that Motion.

The first three Counts of the Amended Complaint, filed November 18, 2005, arise under the Membership Agreement. Best Western asserts that Platinum Properties and/or Lynn Brewer were acting for and on behalf of Prime Tech in executing the Best Western Membership Agreement. Counts I and III of the Amended Complaint assert that Prime Tech, as an undisclosed principal of Platinum and Brewer, is obligated under the membership agreement for payment of (1) the unpaid balance of the Best Western account for services and materials purchased for the hotel, and (2) for liquidated damages for continued use of the Best Western name and trademarks. In Count II, Best Western seeks payment for unpaid services and material furnished to the hotel under the terms of the Membership Agreement and retained by Prime

5

Tech. Counts IV through VII seek damages for trademark infringement and unfair competition relating to Prime Tech's use of the Best Western trademarks in connection with the hotel.

On February 5, 2007, Prime Tech filed the instant Motion for Summary Judgment, arguing that it is entitled to judgment as a matter of law on all counts of the Complaint. Best Western filed a Response, and Prime Tech filed a Reply to that Response. The matter is now fully briefed, and this Order follows.

## DISCUSSION

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id*. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Cain v. Lane*, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex*, 477 U.S. at 324. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland*

6

*v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995).

### I. Counts I, II and III, arising out of the Membership Agreement

As mentioned above, neither Prime Tech nor any of its members actually signed any Best Western Membership Agreement. Nevertheless, Best Western insists that Prime Tech is bound by its terms. Counts I, II and III are grounded in the premise that Platinum Properties and Lynn Brewer signed the Best Western Membership Agreement as an agent for Prime Tech, the undisclosed principal. Prime Tech moves for summary judgment on the grounds that Best Western has failed to produce sufficient evidence to prove the existence of an agency relationship between itself and Platinum Properties or Brewer.

Whether Platinum and Lynn Brewer had authority to act as Prime Tech's agent is determined under state law, and the parties do not dispute that Illinois law applies in this case. Under Illinois law, an undisclosed principal, once discovered, is generally charged with authorized acts of his agent on his behalf in dealings with third parties; however, before one may be held liable as an undisclosed principal on a contract made by and in the name of another, the fact of the agency must be established. 1 ILLINOIS LAW AND PRAC. AGENCY §81 (2006).

Agency is a fiduciary relationship whereby a principal consents that the agent shall act on his behalf. *Morgan v. Kobrin Securities, Inc.*, 649 F. Supp. 1023, 1032 (N.D. Ill. 1986). "The question of whether a principal-agency relationship existed is generally one of fact, but it becomes one of law where the evidence is not disputed." *Anderson v. Boy Scouts of America*, 589 N.E.2d 892, 894 (Ill. App. 1st Dist. 1992). The burden of proving the existence of an agency

relationship and the scope of authority is on the party seeking to charge the alleged principal. *Id*. However, a prima facie case of agency may be established where the evidence, direct or circumstantial, "indicates one individual acting for others under circumstances implying knowledge on the part of the supposed principals of such acts." *Mateyka v. Schroeder*, 504 N.E.2d 1289, 1294 (Ill. App. 5th Dist. 1987).

An agent's authority may be either apparent or actual. *Opp v. Wheaton Lines, Inc*., 231 F.3d 1060, 1064 (7th Cir. 2000) (applying Illinois law). Actual authority may be either express or implied. *Id*. Even in the absence of authority, an undisclosed principal may be bound by the transaction of a purported agent where the principal, with knowledge of the facts, ratifies the transaction. *See Progress Printing Corp. v. Jane Byrne Political Committee*, 601 N.E.2d 1055, 1066 (Ill App. 1st Dist. 1992). Here, Prime Tech argues that Best Western is unable to establish apparent authority, actual authority, or ratification.

### A. Apparent Authority

Under the doctrine of apparent authority, a principal is bound not only by the authority it actually gives to another, but also by the authority that it appears to give. *Opp*, 231 F.3d at 1065. "Apparent authority arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf." *Id*. (quoting *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp*., 577 N.E.2d 1344, 1350 (Ill. App. 3d Dist. 1991)). Because Best Western has argued that it did not learn about Prime Tech until *after* it completed the transaction with Platinum, apparent authority is not at issue in this case.

### B. Actual Authority

Actual authority may be express or implied. *Opp*, 231 F.3d at 1064. An agent has express authority when the principal explicitly grants the agent the authority to form a particular

8

act. *Id*. Here, there is no evidence that Prime Tech granted Platinum or Lynn Brewer any explicit permission, in writing or otherwise, to execute a Best Western Membership Agreement on Prime Tech's behalf, and therefore there is no express authority. Implied authority, on the other hand, is actual authority that is implied from the facts and circumstances, and it may be proved by circumstantial evidence. *Id*.; *Mateyka v. Schroeder*, 504 N.E.2d 1289, 1294, (Ill. App. 5th Dist. 1987).

In response to Prime Tech's assertion that it has not come forward with sufficient facts and circumstances suggesting an agency relationship, Best Western points to the following:

(1) The Purchase Agreement between Prime Tech and Platinum states that Prime Tech agreed to build a "seventy-five (75) room Best Western Motel" project. It is undisputed Prime Tech and Platinum intended that Prime Tech would turn over a complete, "turnkey" operation to Platinum, and "[i]n order to provide or transfer a 'turnkey' Best Western motel project to Platinum and/or Brewer, Prime Tech would necessarily have been required to obtain a Best Western Membership for the project." Pl.'s Resp., at 10.

(2) Prime Tech set aside funds in its construction financing escrow account for the purpose of obtaining a Best Western membership, and Prime Tech's funds were used for that purpose.

(3) Prime Tech authorized members of Platinum to order furniture and furnishings for the hotel project, including mattresses. The mattresses were ordered from Best Western and were delivered to Prime Techs' hotel project, and they remain in use to this date.

(4) During construction, Prime Tech had two outdoor lighted signs erected on the property identifying the hotel as a Best Western.

9

(5) When the sale of the project failed to close, Prime Tech demanded an assignment of the Best Western membership from Platinum to itself.

Upon review of the record and arguments of the parties, the Court finds that the above pieces of evidence, in context, fall short of establishing prima facie case of agency. While Prime Tech concedes that the Purchase Agreement states that Prime Tech was to sell Platinum a hotel identified as a Best Western hotel, there is nothing within the Agreement that suggests Platinum would have the authority to act on Prime Tech's behalf in this respect, or any other. Simply agreeing that vendor will transfer to the purchaser a Best Western hotel does not suggest that purchaser may execute a Best Western Membership Agreement on vendor's behalf. As Prime Tech pointed out in its briefing, "[i]f anything, [the Purchase Agreement] would impliedly give Prime Tech the authority to execute the Membership Agreement on Platinum Properties' behalf as Prime Tech would have been obligated to turn over the Best Western hotel to Platinum Properties. Platinum Properties was always intended to be the end user of the Hotel." Def.'s Reply, at 6.

With respect to payment for the Membership, the record is not clear regarding where Platinum Properties received the funds to initially pay the fees for the Best Western Membership. While Prime Tech concedes that it placed funds in the escrow account and intended that they be used to purchase a Best Western membership, Best Western has in no way disputed Shamsie's testimony that this did not happen until well after Platinum executed and made some payments under the Membership Agreement. According to Prime Tech (and not disputed by Best Western), the initial membership fees were paid to Best Western well before financing for construction was finalized. Even if Prime Tech intended to eventually purchase a Best Western Membership, or even if Platinum did ultimately receive funds from the construction escrow

10

account, this does not equate to granting Platinum the authority to execute the agreement on Prime Tech's behalf and binding Prime Tech to the agreement's terms.

With respect to the mattresses, it is Shamsie's undisputed testimony that while he may have authorized Betty Haytcher or other Platinum members to order furnishings for the hotel, he had no idea that that mattresses were obtained from Best Western; rather, he had assumed that the mattresses came from the Georgia firm and were properly paid for, since the escrow funds allotted for furnishings had been released to and taken by the Platinum members.

The Court does not agree with Best Western's assertion that Prime Tech's demands upon Platinum that it transfer the Best Western membership to Prime Tech, after the sale fell apart, is circumstantial evidence that Prime Tech previously authorized Platinum to contract on its behalf. And while the installation of Best Western signage should have been some clue to Prime Tech that Best Western had in some way been made involved in the project, this piece of circumstantial evidence equally supports the inference that Platinum had executed the Membership Agreement for Platinum's own benefit.  Even so, Prime Tech's awareness of the installation of the Best Western signs, alone, would be insufficient circumstantial evidence from which a reasonable trier of fact could infer that Platinum and/or Brewer possessed actual authority to enter into the Best Western Membership Agreement on Prime Tech's behalf. Therefore, Summary Judgment on the issue of actual authority is granted in Prime Tech's favor.

**C.  Ratification**

As mentioned above, Prime Tech may still be found liable even if it did not expressly or impliedly authorize Platinum to act on its behalf if it ratified the transaction.  Ratification is the equivalent of authorization, but it occurs after the fact, when the principal, with knowledge of the

11

material facts of the unauthorized transaction, takes a position inconsistent with non-affirmation of the transaction. *Progress Printing*, 601 N.E.2d at 1066.

While Best Western has not explicitly argued that any ratification theory should bind Prime Tech, such a theory would also fail to survive summary judgment. While Best Western has alleged that Prime Tech did accept certain benefits under the Membership Agreement, such as mattresses ordered pursuant to the Agreement and the Best Western signs, it has failed to establish that Prime Tech had "knowledge of the material facts" of Platinum's executing the Membership Agreement and the Agreement's terms. Best Western has simply failed to bring to the Court's attention any evidence to competently dispute Prime Tech's evidence that it did not even learn of the transaction until after the deal between Prime Tech and Platinum fell apart.

### D. Conclusion

Best Western, as the party seeking to charge a supposed principal, bears the burden of establishing the agency relationship. Best Western has failed to establish evidence from which a reasonable trier of fact could infer that either an agency relationship existed between Prime Tech and Platinum or that Prime Tech ratified Platinum's execution of the Membership Agreement. Accordingly, based on this record, Prime Tech is not a party to the Best Western Membership Agreement and is entitled to Summary Judgment on Counts I, II, and III of the Complaint.

## II. Counts IV and VII – Trademark Infringement

Count IV of the Complaint sets forth a claim for federal trademark infringement under the Lanham Act, 15 U.S.C. §1114(1). Count VII states a claim for common law trademark infringement. Prime Tech argues that it is entitled to summary judgment on Count IV because Best Western's mark was not used in interstate commerce, and therefore any infringement is not actionable under the Lanham Act. Prime Tech also argues that it is entitled to summary

judgment on both the federal and common law trademark infringement counts because Prime Tech's use, if any, of the Best Western marks did not create any likelihood of confusion.

### A. Interstate Commerce

In order to prevail in an action for trademark infringement under the Lanham Act, a plaintiff must establish that the alleged infringement affected interstate commerce. *Telemed Corp. v. Tel-Med., Inc.*, 588 F.2d 213, 216 (7th Cir. 1978); *Pulte Home Corp. v. Tanglewood Builders Inc.*, 1981 WL 48144 (N.D. Ill. July 9, 1981). Specifically, 15 U.S.C. § 1114(1) provides:

> Any person who shall, without the consent of the registrant —
>
> (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake or to deceive…
>
> …
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

Prime Tech argues that Best Western cannot establish the interstate-activity requirement because the Best Western marks were only displayed during the construction phase[1], there was no solicitation of room rental because the property was still under construction, and Best Western has failed to demonstrate that its interstate activity was affected by the displaying of these signs. Prime Tech also argues that the display of signs during the construction phase was not a use in connection with the sale, offering for sale, distribution, or advertising of any goods or services.

---

[1] Prime Tech argues that after construction, the Best Western signs were not really used at all, let alone used in interstate commerce, because they were covered with Ramada bags. Defendant's argument on this point will be addressed below in the Court's discussion regarding likelihood of confusion.

13

In Response, Best Western states that it "is ludicrous to suggest that Defendant's Hotel property is not, and has not been, engaged in interstate commerce," even before the hotel's opening. Pl.'s Resp., at 12. Best Western argues that the hotel is located near two interstate highways and solicits guests from the traveling public. It also argues that Prime Tech's display of the Best Western signs, even before the hotel's opening, has the purpose and effect of identifying the hotel as being associated with Best Western and identifying the hotel as a future choice for future travel. The record indicates that at least one Best Western franchisee received calls from the public, thinking that the subject hotel was affiliated with it. See Def.'s Ex. 19. According to Best Western, "[v]irtually all lodging businesses begin promoting their future presence in the area in order to make the public aware of the hotel as a choice for future travel." Pl.'s Resp., at 13.

The Lanham Act, as amended, defines "commerce" broadly to mean "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. While the Seventh Circuit has expounded little about the "commerce" requirement of a federal trademark infringement claim, it is well-settled that the requirement is jurisdictional in nature and is satisfied so long as the acts complained of substantially affect interstate commerce, even if the acts are solely intrastate in nature. *See Pulte Home Corp.*, 1981 WL 48144 (citing *Coca-Cola Co. v. Stewart*, 621 F.2d 287, 290 (8th Cir. 1980)); 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §25:56 (5th ed. 2007). "Thus, a federal court has jurisdiction when an intrastate activity potentially diminishes the ability of a plaintiff to control its reputation and product, if that company regularly deals in interstate commerce." *Pulte Home Corp.*, 1981 WL 48144 (citing *Coca-Cola*, 621 F.3d at 290); *see also Franchised Stores of New York, Inc. v. Winter*, 394 F.3d 665 (2d Cir. 1968) (finding that potentially adverse effects of infringement on the plaintiff's

14

reputation and goodwill satisfied the "substantial effect" test); *Maier Brewing Co. v. Fleishchmann Distilling Corp.*, 390 F.2d 117 (9th Cir. 1968) (same); *Pure Foods v. Minute Maid Corp.*, 214 F.2d 792 (5th Cir. 1954) (same).

Here, Prime Tech's display of the Best Western signs, even before the hotel was open for business, could be fairly construed as advertising. It is common practice in many industries for a service or product to be advertised before it is actually available for consumption or purchase by a consumer. Even if the Court ignores Best Western's arguments regarding its marks being displayed near an interstate highway and soliciting interstate travelers, the interstate commerce requirement could be satisfied through the loss of exclusive control over its reputation and goodwill. While Best Western's briefing on this particular issue, with its primary reliance on rhetoric and scant citation to the factual record, falls short of convincing the Court that the interstate-activity requirement of §1114(a) has been satisfied, the Court finds that the record presents at least a genuine dispute of material fact on the matter. Accordingly, Prime Tech's Motion for Summary Judgment on this point is denied.

### B. Likelihood of Confusion

To prevail on a claim of trademark infringement, a plaintiff must establish that (1) its mark is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers. *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001). Prime Tech apparently does not dispute that Best Western can establish that its mark is protectable. However, it insists that Best Western cannot establish that Prime Tech's use of the Best Western signs did not create any likelihood of confusion because those signs were completely "bagged" with and entirely covered by Ramada logos.

15

In evaluating likelihood of confusion in a trademark infringement case, a court engages in an equitable balancing test consisting of the following seven factors:

(a) similarity between the marks in appearance and suggestion;

(b) similarity of the products;

(c) the area and manner of concurrent use;

(d) the degree of care likely to be exercised by consumers;

(e) the strength of the plaintiff's mark;

(f) whether actual confusion exists; and

(g) whether the defendant intended to "palm off" his products as that of the plaintiff.

*Id*. at 677-78. "No single factor is dispositive and courts may assign varying weights to each of the factors depending on the facts presented." *Id*. at 678. While actual confusion is a factor to be considered, a claim of trademark infringement does not require that actual confusion be established; rather, it is the *likelihood* of confusion that serves as the heart of the claim.

Ordinarily, the Court would proceed to apply these seven factors in as thorough a manner as possible. However, certain evidence in this case persuades the Court to veer from its typical course. The Court has reviewed the primary evidence submitted to it, and finds Plaintiff's exhibits 17 and 18 (attached), photographs of the two signs during daylight hours and night time, to be both "illuminating" and dispositive on likelihood of confusion. While a fact finder could be persuaded that the Ramada bags sufficiently obscured Best Western's marks, as viewed during daylight hours, the Court finds Prime Tech's insistence that Best Western's marks were also obscured at night, when the signs were lit, to be downright laughable. The Court will not proceed to explain how heavily the first factor, similarity in appearance, weighs in Best Western's favor, as the pictures in this case are truly worth a thousand words. Not only does the

Court deny Prime Tech's Motion for Summary Judgment with respect to likelihood of confusion, it grants Summary Judgment in Best Western's favor on the issue. Whether the signs were sufficiently altered during daylight hours is a disputed question of material fact, but its resolution will ultimately go to damages, rather than liability.

### III. Count V - Unfair Competition

Count V of the Complaint sets forth a claim for False Designation of Origin and Unfair Competition under 15 U.S.C. § 1125. As with a trademark infringement claim under the Lanham Act, a plaintiff must also establish the jurisdictional "interstate commerce" requirement and likelihood of confusion. *See id.*; *St. Charles Mfg. Co. v. St. Charles Furniture Corp.*, 482 F. Supp. 397, 403 (N.D. Ill. 1979). In line with its arguments under the trademark infringement counts, Prime Tech argues it is entitled to Summary Judgment on this count. For the reasons stated above, Prime Tech's Motion for Summary Judgment is denied with respect to the interstate commerce issue, and Summary Judgment is granted in Best Western's favor on the likelihood of confusion issue.

### VI. Count VI – Trademark Dilution

Count VI of the Complaint sets forth a claim of Federal Trademark Dilution under 15 U.S.C. §1125. Section 1125(c) entitles the owner of a famous trademark an injunction against another person's commercial use of the mark. The owner may also recover additional remedies under Section 1117(a), but only if the offending use is first used in commerce after October 6, 2006. 15 U.S.C. § 1125(c)(5). Prime Tech argues that because it is no longer using the Best Western signs in any way, and they came down well before October 6, 2006, Summary Judgment on this Count is proper. In its Response to Prime Tech's Motion for Summary Judgment, Best Western did not respond to this argument, and the Court therefore construes this

17

portion of the Motion as uncontested. Accordingly, Prime Tech's Motion for Summary Judgment on Count VI is granted.

## CONCLUSION

For the reasons set forth above, Prime Tech's Motion for Summary Judgment [#20] is GRANTED with respect to Counts I, II, III, and VI, and DENIED with respect to Counts IV, V, and VII. Additionally, the Court enters Judgment in favor of Best Western on the issue of likelihood of confusion, which is relevant to Counts IV, V, and VII.

ENTERED this 20th day of April, 2007.

          s/Michael M. Mihm
          Michael M. Mihm
          United States District Judge